UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                                                                                                                      DECISION AND ORDER

       -v-                                                                                                                   08-CR-6210 CJS

REYNALDO VELEZ,

                 Defendant.

_____

## INTRODUCTION

The defendant, Reynaldo Velez ("Velez"), stands accused of six counts in a multi-defendant indictment relating to drug trafficking and money laundering. The defendant has moved to suppress statements he purportedly made to the police on December 14, 2007, and on October 29, 2008.

In regard to the defendant's application, a hearing was held on January 20 and February 9, 2011. Officers Edmund Bernabei ("Bernabei"), Elvin Ramos ("Ramos"), both of the Rochester Police Department, Special Agent John Hayes ("Hayes") of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and Besayda Soto, a Spanish interpreter, ("Soto") all testified at the hearing.

The Court, having considered the testimony presented and exhibits received into evidence at the hearing, and having made evaluations regarding credibility, makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

Bernabei is a police officer with the City of Rochester Police Department, and he has been so employed for over twenty-one years. For the past ten years, he has been assigned to the Special Investigations Section ("SIS"). On December 14, 2007, at about 6:55 p.m., he had occasion to assist in the execution of a search warrant at 259 Arbutus Street in Rochester, New York. Velez was inside 259 Arbutus Street when the search warrant was executed, and he was taken into custody and transported to the third floor of the Public Safety Building ("PSB"). After arriving at the PSB, Bernabei was alerted to the fact that the defendant along with other individuals taken into custody at 259 Arbutus Street spoke Spanish, and that a Spanish interpreter would therefore be needed. As a result, Ramos, a Spanish speaking officer with the Rochester Police Department, arrived at the PSB.

Ramos has been employed by the Rochester Police Department as a police officer for about six years. Prior to that, he worked for the New York City Police Department as a police officer for approximately four years. Ramos can speak, read, and write both Spanish and English. In that regard, Ramos, was born in Puerto Rico of Spanish-speaking parents. He lived in Puerto Rico for about five years, and attended school there where the classes were in Spanish. Subsequently, his parents moved to New York City, and he grew up speaking both Spanish and English. Although fluent in English, Ramos has continued to speak Spanish on a daily basis with his wife and sister-in-law at home and with co-workers at the police department. Additionally, he acts as a Spanish interpreter with the Rochester Police Department and also assists other police agencies in that regard when requested. Moreover, as a New York City police officer, he acted as a Spanish interpreter

on a daily basis.

When Ramos arrived at the PSB, Bernabei spoke to him briefly. He explained to Ramos the circumstances of the execution of the search warrant, including what was found, and told Ramos that he needed him to assist in the interviews of two individuals who had been taken into custody. Bernabei and Ramos then entered interview room # 361 in which the defendant was located at approximately 10:55 p.m. At that point, the defendant had been in custody for about four hours.

The defendant, who was handcuffed, was seated to the right of the table inside the room. Upon entering, Bernabei and Ramos introduced themselves, and Ramos inquired of the defendant in Spanish whether he would rather be asked questions in English or Spanish. The defendant replied that he felt more comfortable with Spanish. Next, Ramos asked the defendant in Spanish if he needed anything. The defendant responded in Spanish, which Ramos translated for the benefit of Bernabei, that he needed to use the bathroom. His handcuffs were removed, and he was allowed to use a bathroom just outside interview room # 361, and then was returned to the room.

Upon returning to interview room # 361, the defendant's handcuffs remained off. He took a seat at the table, and Bernabei and Ramos sat across from him. Ramos explained to the defendant that Bernabei wanted to ask him some questions regarding the search earlier that day, and that if the defendant was comfortable in doing so, they needed to follow procedure and he needed to be advised of his constitutional rights. The defendant agreed to answer questions. Ramos then utilized a two-sided notification card in English, which Bernabei had given him, received into evidence as Exhibit # 1, to advise the defendant of his constitutional rights. This occurred at 11:04 p.m. Prior to advising the

defendant of his rights, Ramos completed one side of the card, which called for information such as the time and date. Ramos asked the defendant in Spanish for his educational level and recorded the defendant's answer of 9th grade on that same side of the card. Ramos then turned the card over and translated verbatim into Spanish the five warnings. After translating each warning into Spanish, Ramos asked the defendant, again in Spanish, if he understood that specific warning, and as to each, the defendant responded in Spanish, "yes." After translating all five warnings as they appeared on Exhibit # 1, Ramos asked the defendant in Spanish the two waiver questions that appear at the bottom of the card. He first asked the defendant, whether he understood the rights that he had just read to him, to which the defendant responded in Spanish, "yes." He then asked the defendant in Spanish whether he was willing to give up those rights and speak with the police, to which the defendant also responded in Spanish, "yes."

Bernabei and Ramos then proceeded to interview the defendant. The interview was conducted by question and answer. Bernabei asked questions in English, Ramos translated them into Spanish, the defendant responded in Spanish, and Ramos translated the answers into English. The interview lasted for about forty-five minutes. At that point, Bernabei left the interview room. Ramos then asked the defendant in Spanish if he was willing to give a signed statement. The defendant replied in Spanish, "yes," and Ramos then wrote out a statement in Spanish, which he went over line by line with the defendant, reading each sentence aloud to the defendant in Spanish to make sure it was exactly what the defendant wanted to say. Once the written statement, which was received into evidence as Exhibit # 2, was completed, Ramos asked the defendant in Spanish to sign and initial it. The defendant did, and Ramos also signed, witnessing the defendant's

signature. After the defendant signed the statement, Ramos asked him if there was anything he wanted to add. In response, the defendant indicated to Ramos that he did want to add something. Ramos made the addition at the defendant's request on Exhibit # 2 underneath where the defendant had signed and where Ramos had witnessed his signature. Ramos then read the addition back to the defendant in Spanish to make sure it was correct. After doing so, Ramos asked the defendant in Spanish to sign and initial the addition, which the defendant did and Ramos again witnessed his signature.  It took approximately another forty-five minutes to complete the written statement

At no time, during the course of the interview or the taking of the written statement did the defendant ever indicate that he did not want to speak with Bernabei or Ramos. Neither, during that time, did the defendant ever indicate that he wanted a lawyer. At no time did Bernabei or Ramos ever threaten the defendant, use any force against him, or make him any promises to get him to speak with them. The defendant did not appear to be under the influence of alcohol or drugs. Moreover, the defendant never complained of any illness or medical condition, and throughout the interview process, including the taking of the written statement, he was calm and cooperative, and just wanted the opportunity to tell his side of the story. Furthermore, the defendant responded coherently to the questions Ramos asked him in Spanish, and never indicated that he had any difficulty understanding Ramos. Other than his request to use the bathroom, which was granted, he did not have any other requests.

Hayes is a special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and  has been so employed for approximately eleven years. He currently works with ATF as a criminal investigator. On October 29, 2008, Hayes, pursuant

to his duties with ATF, participated in the execution of arrest and search warrants in a multi-suspect case. One of the individuals arrested on that date was the defendant, who was taken into custody at approximately 8:22 a.m. Although Hayes was not involved in the arrest of the defendant, he had contact with him at the PSB in an interview room on the third floor.

Soto grew up in Puerto Rico and Spanish is her primary language. She attended school in Puerto Rico, and from kindergarten through 12th grade, all her classes were in Spanish. She then attended college in Puerto Rico to become a nurse, during which time the courses that she took were in English. Subsequently, she moved to New York State, where she took further college courses in English. Soto has a total of three and a half years of college education, all in English. Upon coming to New York, she started working as a Spanish interpreter. For approximately the last six years, she has been working as a Spanish interpreter in District Court for the Western District of New York. Additionally, she worked for an agency, and in that capacity, acted as a Spanish interpreter for hospitals and doctors' offices.

At 12:41 p.m., Hayes, along with Bernabei and Soto, entered the interview room in which the defendant was located. Hayes and Bernabei were in street clothes and neither had a firearm. Soto accompanied Hayes and Bernabei, since Hayes had been made aware that the defendant did not speak English, or at least did not speak English very well. Before entering the interview room, Hayes had explained to Soto, that he and Bernabei would be asking the defendant questions in English, which she should translate into Spanish. Hayes further explained to Soto that she should translate into English any responses the defendant made in Spanish to the questions.

The interview room contained a table and two chairs affixed to the wall. Hayes brought two additional free standing chairs into the interview room. At the time Hayes, Bernabei, and Soto entered the interview room, the defendant, who was not handcuffed, was seated on one of the fixed chairs. Upon entering the interview room, Hayes, Bernabei, and Soto introduced themselves to the defendant. After the introductions were concluded, Hayes had Soto read the defendant his constitutional rights at 12:50 p.m. from a two-sided Spanish notification and waiver card, received into evidence as Exhibit # 3. Bernabei completed the informational side of the card, and Soto read the defendant the five warnings exactly as they appear in Spanish on the card itself. The English translation of the five warnings that Soto read to the defendant in Spanish is as follows:

1. You have the right to remain silent; if you don't want to say anything, you don't have to.

2. Anything you do say can be used against you in a court of law.

3. You have the right to consult an attorney before you answer any question and, if you want, you can have the attorney present.

4. If you can't afford the services of any attorney, one will be provided to you before we question you if you want it that way.

5. If you decide to talk to me, you can stop at any moment.

After reading the warnings as they appear on Exhibit # 3, Soto then read the defendant the two waiver questions on Exhibit # 3. The English translation of the first question is, "do you understand what I have just told you?" Upon being asked this question in Spanish by Soto, the defendant responded in Spanish, "yes." Soto then read the second question on Exhibit # 3, which translated into English is, "are you willing to give up your rights and talk with me right now?" Again, the defendant responded in Spanish, "yes." The

defendant was then interviewed by question and answer. In that regard, Soto translated into Spanish questions put to the defendant by Hayes and Bernabei, and she translated the defendant's answers into English. The defendant responded coherently to the questions that Soto asked, and at no time during the interview did he ever tell Soto that he had any difficulty understanding her. While the defendant did appear to be upset, he calmly answered every question that Soto asked him.

During the course of the interview, the defendant never indicated to Soto that he didn't want to speak with her and the officers or that he wanted a lawyer. No one ever promised the defendant anything to get him to talk, and no one used physical force on him or threatened him in any way to get him to speak. Moreover, the defendant never complained that he was sick or injured, nor did he have any requests during the interview. Further, the defendant did not appear to be under the influence of alcohol or drugs.

The interview concluded at about 1:31 p.m., at which time the defendant, pursuant to his request, was taken to the bathroom. He was then returned to the interview room. At that time, Soto advised him in Spanish that he was going to be turned over to the United States Marshals Service and brought to federal court for arraignment.

## CONCLUSIONS OF LAW

It is well settled that the government may not use any statements obtained from a defendant, whether exculpatory or inculpatory, which were the product of custodial interrogation, unless prior to any questioning the defendant was advised of his constitutional rights and knowingly, intelligently and voluntarily waived such rights. *Miranda v. Arizona*, 384 U.S. 436 (1966); *Colorado v. Spring*, 479 U.S. 564 (1987); *Edwards v. Arizona*, 451 U.S. 477 (1981). That is, the government bears the burden of proving by a

preponderance of the evidence both that a defendant was advised of his constitutional rights guaranteed under *Miranda* and that he knowingly, intelligently and voluntarily waived his rights. *Lego v. Twomey*, 404 U.S. 477, 482-89 (1972). To establish a valid waiver, the government must prove that the relinquishment of rights on a defendant's part was voluntary, and additionally that the defendant had a full awareness of the right being waived and of the consequences of waiving that right. *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995).

Moreover, it is well settled that the statements of a defendant himself must be voluntary based on the "totality of the circumstances." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). In that regard, the burden is on the government to prove that a confession is voluntary by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). A statement is not voluntary if it is obtained by any type of physical or psychological coercion or by improper inducement so that a defendant's will was overborne. *Hayes v. State of Washington*, 373 U.S. 503, 513-14 (1963). In other words, a confession is "involuntary" if it is obtained by "'techniques and methods offensive to due process' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (quoting *Haynes v. Washington*, 373 U.S. 503, 515 (1963)). "No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988). The totality of the surrounding circumstances are evaluated "to determine whether the government agents' conduct 'was such as to overbear

[a defendant's] will to resist and bring about confessions not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir. 1993) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987)). "The factors to be considered include 'the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation.'" *United States v. Alvarado*, 882 F.2d 645, 649 (2d Cir. 1989) (quoting *United States v. Mast*, 735 F.2d 745, 749 (2d Cir.1984)).

A language barrier is certainly a factor to consider when determining the validity of a waiver. *United States v. Heredia-Fernandez*, 756 F.2d 1412, 1415 (9th Cir. 1985), *cert. denied*, 474 U.S. 836 (1985)) ("One precondition for a voluntary custodial confession is a voluntary waiver of *Miranda* rights, and language difficulties may impair the ability of a person in custody to waive these rights in a free and aware manner.") However, the determination is not difficult when the suspect is advised of his rights in a language that he understands. *United States v. Boon San Chong*, 829 F.2d 1572, 1574 (11th Cir. 1987).

**A.   Statements of December 14, 2007**

Based upon the above-stated principles of law and its findings of fact, the Court concludes that the oral statements, made by the defendant to Bernabei and Ramos, as well as the written statement made by the defendant to Ramos, are admissible. In that regard, the Court finds that the government has established by a preponderance of evidence that prior to any questioning, the defendant was advised of his constitutional rights as guaranteed by the *Miranda* decision and that he knowingly, intelligently, and voluntarily waived his rights and agreed to speak to Bernabei and Ramos.

First, in reaching its determination as to the defendant's *Miranda* warnings, the Court relies on several facts as detailed above. Upon entering the interview room with Bernabei, Ramos asked the defendant in Spanish, if he would prefer to be asked questions in English or Spanish to which the defendant responded Spanish.  Thereafter, Ramos spoke only Spanish to the defendant. Moreover, Ramos asked the defendant if he needed anything, and when the defendant replied that he needed to use the bathroom, his handcuffs were removed and he was allowed use the bathroom just outside interview room #361.  Upon returning to the interview room, Ramos explained to the defendant who remained uncuffed, that before he could speak to the defendant or ask him any questions, he had to advise the defendant of his rights, to which the defendant responded in Spanish, "okay." Ramos read the defendant verbatim in Spanish his constitutional rights as they appear on Exhibit # 1. After reading the defendant his rights, Ramos asked him if he understood his rights as they had been read to him, to which the defendant responded in Spanish, "yes." Ramos then asked the defendant if he was willing to speak with him, to which the defendant also responded in Spanish, "yes." During the interview, the defendant responded to the questions that Ramos asked, and he did so in a coherent fashion. Moreover, the defendant never told Ramos that he had any trouble understanding him.

The defendant did not complain to Ramos that he was sick or injured, nor did he appear to Ramos to be under the influence of alcohol or drugs. Rather, the defendant appeared normal to Ramos.  At no time during the interview did the defendant ever indicate that he wanted an attorney, nor did he ever indicate that he did not want to speak with the police.

Second, as to its determination on voluntariness, the Court again relies on its findings of fact. Upon entering the interview room with Bernabei, Ramos asked the defendant if he needed anything, and when the defendant, in response, requested to use the bathroom, he was allowed to do so. The interview itself was brief and lasted only about forty-five minutes on December 14, 2007. Prior to the interview, the defendant was advised of his *Miranda* warnings in Spanish, and indicated both that he understood them and that he was willing to give them up and speak to the police. During the course of the interview, the defendant responded in Spanish to the questions that Ramos asked him, and his responses were coherent. The defendant appeared normal to Ramos and was very calm and coherent. At no time during the interview did Ramos or Bernabei ever threaten the defendant or use any physical force against him to get him to speak with them. Additionally, neither Ramos nor Bernabei made the defendant any promises to get him to talk. At no time did the defendant ever indicate to Ramos that he had any trouble understanding him. Moreover, the defendant never indicated that he wanted a lawyer, nor did he ever indicate that he did not want to talk with the police.

Further, the defendant did not appear to Ramos to be under the influence of alcohol or drugs, nor did the defendant complain of any illness or medical condition. Therefore, the preponderance of evidence establishes that the statements made to Ramos and Bernabei. were not the result of any physical or psychological coercion, or by the exertion of any type of improper influence, but, rather, were voluntarily made.

**B.  Statements of October 29, 2008**

Again, in consideration of the above-stated principles of law and its findings of fact, the Court concludes that the oral statements, made by the defendant to Soto, Hayes, and

Bernabei, are admissible. In that regard, the Court finds that the government has established by a preponderance of evidence that prior to any questioning, the defendant was advised of his constitutional rights as guaranteed by the *Miranda* decision and knowingly, intelligently, and voluntarily waived his rights and agreed to speak to Soto, Hayes, and Bernabei. First, in reaching its determination as to the defendant's *Miranda* warnings, the Court relies on several facts as detailed above. Soto spoke only Spanish to the defendant. Upon entering the interview room, Soto, Hayes, and Bernabei all introduced themselves to the defendant. Soto read the defendant verbatim his constitutional rights as they appear in Spanish on Exhibit # 3.  This was the second time the defendant had been advised of his constitutional rights, since, as indicated above, he had been previously advised of his rights in Spanish on December 14, 2007.   After reading the defendant his rights exactly as they appear on Exhibit # 3, Soto read the defendant the two waiver questions that appear on the card, and to each the defendant responded in Spanish, "yes." The defendant responded coherently to the questions that Soto asked him, and at no time during the interview did he ever tell Soto that he had any difficulty understanding her. During the interview, although the defendant appeared to be upset, he calmly answered every question that Soto asked him.

      The defendant did not complain to Soto of any illness or medical condition, nor did he appear to Hayes to be under the influence of alcohol or drugs.  At no time during the interview did the defendant ever indicate that he wanted an attorney, nor did he ever indicate that he did not want to speak with the police.

Second, as to its determination on voluntariness, the Court once more relies on its findings of fact. During the interview, the defendant did not have any requests, however upon completion, he asked to use the bathroom and was allowed to do so. The interview process itself was relatively brief. The defendant was advised of his rights at 12:50 p.m. and the interview concluded at 1:31 p.m. lasting only about forty minutes. Prior to the interview, the defendant was read his *Miranda* warnings in Spanish, and indicated both that he understood them and that he was willing to give them up and speak to the police. During the course of the interview, the defendant responded to the questions in Spanish that Soto asked him, and his responses were coherent. The defendant appeared normal to Ramos and was very calm and coherent. At no time during the interview did Hayes, Bernabei, or Soto for that matter ever threaten the defendant or use any physical force against him to get him to speak with them. Additionally, no one made the defendant any promises to get him to talk. At no time did the defendant ever indicate to Soto that he had any trouble understanding her. In addition, the defendant never indicated that he wanted a lawyer, nor did he ever indicate that he did not want to talk with the Soto and the officers.

Further, the defendant, did not appear to be under the influence of alcohol or drugs, nor did the defendant complain of any illness or medical condition. Therefore, the preponderance of evidence establishes that the statements made to Soto, Hayes, and Bernabei were not the result of any physical or psychological coercion, or exertion of any type of improper influence, but, rather, were voluntarily made.

## CONCLUSION

Accordingly, the defendant's application (Docket # 622) to suppress statements is denied in its entirety.

IT IS SO ORDERED.

DATED:    April 1, 2011
         Rochester, New York      ENTER.


                                  /s/ Charles J. Siragusa
                                  CHARLES J. SIRAGUSA
                                  United States District Court Judge